UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| S. N. B., *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 3:13-CV-441 |
| | § | |
| PEARLAND INDEPENDENT | § | |
| SCHOOL DISTRICT, *et al*, | § | |
| | § | |
| Defendants. | § | |

**<u>MEMORANDUM AND ORDER</u>**

After Plaintiff S.B.'s junior high school principals discovered that she sent what they termed a "lewd" image of a female friend to other students, they sent her to a disciplinary learning program for 30 days. In the year preceding that transfer, S.B. alleges that she was subject to repeated bullying on and off campus. She now asserts a variety of federal and state law claims—including due process violations, negligence, and failure to report suspected child abuse—against Defendants Pearland Independent School District and the principal and assistant principal of her school, Jason Frerking and Tony Barcelona. Defendants argue that S.B.'s claims should be dismissed on immunity grounds and for failure to state a claim. They also contend that S.B. should be denied leave to amend her complaint because the three new claims she wants to raise—most notably, a free speech claim—would be futile.

## I.   BACKGROUND[1]

Plaintiff S.B. attends Pearland Junior High School South in the Pearland Independent School District (PISD).  During the 2012-2013 school year—when she was 12 years old—her classmates started to bully her.  They physically assaulted her, sent her harassing messages, and wrote lewd comments about her on the internet.  Docket Entry No. 10 at 5–6.  She told school officials about the harassment, and the officials alerted her father.  Although he lodged numerous verbal and written complaints, the bullying continued, and the officials told Bailey that they could "do nothing" about it.  *Id.*

At the beginning of the next school year, her assistant principal, Defendant Tony Barcelona, called her into his office.  He wanted to discuss what he termed "lewd" images of S.B. and her friend that had circulated between students off campus.  The complaint is unclear as to what, exactly, the images displayed; in fact, S.B. alleges that Barcelona never showed her or her father the particular photographs that the school considered problematic because they "no longer existed."[2]  *Id.* at 7.  After the meeting with Barcelona, S.B. was transferred to PISD's   Alternative   Learning   Academy,   which   is   a   disciplinary   alternative

---

[1] The background section is based on allegations in Plaintiff's First Amended Complaint, *see* Docket Entry No. 10, which the Court must assume to be true at this stage.

[2] S.B.'s counsel appears to have a copy of the particular image at issue. At the Court's initial scheduling conference, he likened it to the photographs typically found in Sports Illustrated's Swimsuit Issue.  The image has not been provided as an exhibit and is not a part of the record in this case.

education program, for 30 days.  The program provides "an alternative educational process for students who have committed persistent or serious violations of the Student Code of Conduct" and works "toward changing student attitudes and behavior toward a more positive experience."[3]   Barcelona explained to S.B.'s father that she was being punished for sending inappropriate pictures of herself and her friend to other students off school grounds.  Defendant Jason Frerking, the school's principal, cited PISD's Student Code of Conduct and Handbook, which prohibits students from:

> Send[ing], post[ing] or possess[ing] electronic messages that are abusive, obscene, sexually oriented, threatening, harassing, damaging to another's reputation or illegal, including cyber-bulling and 'sexting' either on or off school property, if the conduct causes a substantial disruption to the educational environment.

Docket Entry No. 10 at 8.

S.B. did not challenge her transfer to Alternative Learning Academy through PISD's internal appeals process.  Rather, she filed this suit through her father in state court, which Defendants then removed to this Court.  Although the state court petition detailed the bullying that S.B. allegedly faced at Pearland South, it did not set out any causes of action related to that bullying.  Rather, it sought injunctive relief to prevent transfer to the alternative program and damages under section

---

[3] *See* Alternative Learning Academy, Pearland Independent School District, *available at* http://www.pearlandisd.org/PACE.cfm?subpage=147.

1983 for violations of her procedural due process rights.  Docket Entry No. 1-1 at 9–11.  After removal, S.B. amended her complaint to assert state law claims related to the bullying.  Because she is now back at Pearland Junior High School South, she no longer seeks injunctive relief, but only damages and a declaratory judgment. She seeks those remedies based on the following six claims asserted against PISD and against Barcelona and Frerking in their official and individual capacities: (1) a claim that four terms in PISD's Code of Conduct—"obscenity," "sexually oriented," "sexting," and "substantial disruption"—are unconstitutionally vague; (2) a federal procedural due process claim; (3) a state due process claim; (4) a negligence claim based on Defendants' failure to stop S.B. from being bullied; (5) a state law claim for failure to report suspected child abuse; and (6) a state law claim for failing to develop a policy for reporting suspected child abuse. Defendants argue that all of these claims should be dismissed.

After Defendants filed their motion to dismiss, S.B. requested an opportunity to file a second amended complaint, through which she would assert three new claims: (1) a claim that Defendants violated her constitutional free speech and privacy rights; (2) an equal protection claim that Defendants treated her more harshly than male and female students with similar infractions; and (3) a retaliation claim based on criminal charges that she alleges Defendants caused to be brought against her after she filed this lawsuit.  Defendants oppose the motion to amend,

primarily on the basis that that the amendments would be futile but also on the ground that S.B. acted with undue delay in asserting them. Docket Entry No. 19. The Court first addresses the issues raised by Defendants' motion to dismiss before considering the motion for leave to amend.

## II.   RULE 12 STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) allows dismissal if a plaintiff fails to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). In evaluating a Rule 12(b)(6) motion, the "court accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004) (quoting *Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999)). The court does not look beyond the face of the pleadings to determine whether the plaintiff has stated a claim. *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). To survive a motion to dismiss, a claim for relief must be "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

## III.   MOTION TO DISMISS

### A. Vagueness

S.B. was punished under PISD's student code of conduct, which forbids students from sending electronic messages that are, among other things, "abusive, obscene, [or] sexually oriented." Docket Entry No. 10 at 8. She seeks a

declaratory judgment under the federal Due Process Clause[4] that four of its terms are unconstitutionally vague: obscenity, sexually oriented, sexting, and substantial disruption.  A law is unconstitutionally vague when persons "of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926).  "The doctrine incorporates notions of fair notice or warning. Moreover, it requires legislatures to set reasonably clear guidelines for law enforcement officials and triers of fact in order to prevent 'arbitrary and discriminatory enforcement.'"  *Smith v. Goguen*, 415 U.S. 566, 572–73 (1974) (footnotes omitted).

Facial vagueness challenges—especially of school regulations—are not easily won.[5]  *See, e.g.*, *Bystrom v. Fridley High Sch., Indep. Sch. Dist., No. 14*, 822 F.2d 747, 752 (8th Cir. 1987) (upholding school guidelines that prohibited "pervasively indecent or vulgar" material despite acknowledging that such concepts "contain large elements of subjectivity . . . on which reasonable people might well differ").  Courts sustain "facial challenge[s] to the vagueness of a law 'only if the enactment is impermissibly vague in all of its applications.'"  *Home Depot, Inc. v. Guste*, 773 F.2d 616, 627 (5th Cir. 1985) (quoting *Vill. of Hoffman*

---

[4] Though the First Amended Complaint does not state the vehicle through which S.B.'s vagueness challenge is being brought, the Court assumes that S.B. is asserting a vagueness challenge under the Fourteenth Amendment's Due Process Clause through section 1983.

[5] Because the Court has not seen the photograph at issue and it is not described in the First Amended Complaint, S.B. cannot bring an as-applied challenge to the terms in PISD's code of conduct.

*Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 495 (1982) (emphasis removed)).  This is particularly hard for students to show in the school context because school disciplinary rules "need not be as detailed as a criminal code which imposes criminal sanctions."  *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 686 (1986); *see also Murray v. W. Baton Rouge Parish Sch. Bd.*, 472 F.2d 438, 442 (5th Cir. 1973) ("[S]chool disciplinary codes cannot be drawn with the same precision as criminal codes."); *cf. Taylor v. Rosewell Indep. Sch. Dist.*, 713 F.3d 25, 48 n.21 (10th Cir. 2013) (explaining in case involving challenge to school regulations on vagueness grounds that "[i]n more recent years . . . the [Supreme] Court has been much less protective of speech in school environment and much more deferential to school authorities." (internal quotation marks and citations omitted)).  As the Seventh Circuit cogently explained:

> [S]chools are different. Their duties and responsibilities are primarily custodial and tutelary and thus discretionary in nature, not legalistic. An education in manners and morals cannot be reduced to a simple formula; nor can all that is uncivil be precisely defined. What is insulting or rude very often depends on contextual subtleties. A shockingly indecorous act at the dinner table may be par for the course in the locker room or on the playground. If the schools are to perform their traditional function of "inculcat[ing] the habits and manners of civility," *Fraser*, 478 U.S. at 681, they must be allowed the space and discretion to deal with the nuances. The touchstone is reasonableness . . . .

*Muller by Muller v. Jefferson Lighthouse Sch.*, 98 F.3d 1530, 1542–43 (7th Cir. 1996); *see also Fraser*, 478 U.S. at 676 ("Nothing in the Constitution prohibits the

states from insisting that certain modes of expression are inappropriate and subject to sanctions. The inculcation of these values is truly the work of the school, and the determination of what manner of speech is inappropriate properly rests with the school board." (internal citations and quotation marks omitted)).  Thus, schools do not need to "spell out in intricate detail precisely what" they mean by terms like "obscene" or "sexually oriented." *Muller*, 98 F.3d at 1542.  Addressed in turn below, the challenged terms withstand this level of constitutional vagueness scrutiny because they give "reasonable [middle] school student[s] of ordinary intelligence" an opportunity to know what conduct is prohibited. *Taylor*, 713 F.3d at 51.

The Supreme Court has spoken at length about the appropriate constitutional standard for determining obscenity, the first term S.B. challenges on vagueness grounds. *See Miller v. California*, 413 U.S. 15, 24 (1973) (setting out a three-part test to define obscenity).  And in *Fraser*, which involved a student who was punished for delivering a lewd public speech, the Court upheld the school's punishment and concluded by noting that "[t]he school disciplinary rule proscribing 'obscene' language . . . gave adequate warning to [the student] that his lewd speech could subject him to sanctions."  478 U.S. at 686.  Given these clear precedents, the Court cannot conclude that the word "obscene," as used in PISD's Code of Conduct, is unconstitutionally vague. *Cf. P. A. B., Inc. v. Stack*, 440 F.

Supp. 937, 943–44 (S.D. Fla. 1977) ("[A] definition by judicial construction comports with the requirements of due process since it provides an individual with sufficient notice of what conduct is proscribed by the statute in question.").

The second challenged term—"sexually oriented"—modifies "electronic messages."   Numerous courts within and outside the Fifth Circuit have upheld restrictions subject to more exacting review that used similar terms: for instance, state prohibitions on "sexually oriented businesses."   *See, e.g.*, *SDJ, Inc. v. City of Houston*, 837 F.2d 1268, 1278 (5th Cir. 1988) (upholding terms in a city ordinance imposing restrictions on sexually oriented businesses); *Richland Bookmart, Inc. v. Nichols*, 137 F.3d 435, 441 (6th Cir. 1998) (holding that terms used in ordinance, including "sexually oriented materials," were not vague because "[m]ost buyers, sellers and judges know what such materials are").   Given that those regulations were upheld, a ban on "sexually oriented" electronic images in the school context withstands a vagueness challenge.

The remaining two challenged terms likewise pose few obstacles.   Though "sexting" is a relatively new word arising from recent technological developments, it has been defined, with remarkable consistency, by federal courts across the country.   They generally agree that sexting is "the exchange of sexually explicit text messages, including photographs, via cell phone."   *United States v. Broxmeyer*, 616 F.3d 120, 123 (2d Cir. 2010); *see also Miller v. Mitchell*, 598 F.3d

139, 143 (3d Cir. 2010) (describing sexting as "the practice of sending or posting sexually suggestive text messages and images, including nude or semi-nude photographs, via cellular telephones or over the Internet."); *Logan v. Sycamore Cmty. Sch. Bd. Of Educ.*, 780 F. Supp. 2d 594, 595 n.1 (S.D. Ohio 2011) ("Sexting is the act of sending sexually explicit messages or photographs, primarily between mobile phones."). Given the uniformity of this definition, its significant overlap with the term "sexually oriented" already discussed, and the fact that the word "sexting" has become ubiquitous enough that it was recently added to the Merriam-Webster Dictionary,[6] ordinary middle school students would undoubtedly understand the meaning of a "sexting" ban.

Finally, S.B. challenges the PISD Code of Conduct's ban of conduct that would cause a "substantial disruption to the educational environment." Docket Entry No. 10 at 8. But this language comes directly from the most famous school law case ever issued, *Tinker v. Des Moines Independent School District*, in which the Supreme Court held that school officials could constitutionally ban student speech on campus only if they had ascertained "facts which might reasonably have led [them] to forecast substantial disruption of or material interference with school activities, . . . or disorders on the school premises." 393 U.S. 503, 509 (1969).

---

[6] *See* Sexting, Merriam-Webster Online: Dictionary and Thesaurus, *available at* www.merriam-webster.com (defining "sexting" as "the sending of sexually explicit messages or images by cell phone").

The "substantial disruption" standard has thus been an integral part of school discipline for many years; courts have repeatedly upheld school policies that are "intended to codify the rule of *Tinker*."   *Taylor*, 713 F.3d at 48 (citing Sixth, Seventh, and Eighth Circuit cases that upheld policies prohibiting conduct that would cause a "substantial disruption" to the school environment).   As with the other challenged terms, "substantial disruption" is not unconstitutionally vague.

Because all four terms survive the comparatively lenient scrutiny imposed on school regulations, the Court will dismiss S.B.'s request for a declaratory judgment that PISD's Code of Conduct is unconstitutionally vague.

**B. Procedural Due Process[7]**

       *i.*     *Federal Due Process Claims*

S.B.'s procedural due process claims fail under Fifth Circuit precedent, which establishes that her transfer to the Alternative Learning Academy did not implicate her constitutional rights.   To establish a due process claim, S.B. must first identify a liberty or property interest at stake.   *See Baldwin v. Daniels*, 250 F.3d 943, 946 (5th Cir. 2001).   Although students have a protected interest in education, *Goss v. Lopez*, 419 U.S. 565, 574 (1975), the Fifth Circuit has held that

---

[7] Though it is unclear whether S.B. is in fact asserting a federal substantive due process claim, Defendants read the complaint as asserting one. If indeed it does, this claim also fails because no case law establishes a substantive due process right in this context.   *See Washington v. Glucksberg*, 521 U.S. 702, 722 (1997) ("[T]he development of this Court's substantive-due-process jurisprudence . . . has been a process whereby the outlines of the 'liberty' specially protected by the Fourteenth Amendment . . . have at least been carefully refined by concrete examples involving fundamental rights found to be deeply rooted in our legal tradition.").

students have no cognizable liberty or property interests in preventing a school from transferring them to a disciplinary alternative education program.  In *Nevares v. San Marcos Consolidated Independent School District*, a student who had been arrested for aggravated assault was sent to an alternative education program without the opportunity to meet with school officials to discuss possible disciplinary options.  111 F.3d 25, 26 (5th Cir. 1997).  The court held that no constitutional violation occurred because the student was "not being denied access to public education, not even temporarily.  He was only to be transferred from one school program to another program with stricter discipline."  *Id.* at 26.  The Fifth Circuit recently reaffirmed *Nevares*.  *See Harris ex rel. Harris v. Pontotoc Cnty. Sch. Dist.*, 635 F.3d 685, 690 (5th Cir. 2011) ("A student's transfer to an alternative education program does not deny access to public education and therefore does not violate a Fourteenth Amendment interest.").

Because S.B. was not expelled (she was transferred), she was not deprived of a recognized liberty or property interest.  Therefore, the procedures used in that decision are not subject to constitutional requirements, and her federal due process claims must therefore be dismissed.

> ii.    *Texas Due Process*

Although the words of the due process clauses in the Texas Constitution and United States Constitution differ,[8] Texas courts have generally followed federal interpretations of procedural due process issues.  *See Univ. of Tex. Med. Sch. at Houston v. Than*, 901 S.W.2d 926, 929 (Tex. 1995) ("[I]n matters of procedural due process, we have traditionally followed contemporary federal due process interpretations of procedural due process issues."); *see, e.g.*, *Spring Branch Indep. Sch. Dist. v. Stamos*, 695 S.W.2d 556, 561 (Tex. 1985) (agreeing with federal due process interpretations that held that due process guarantees do not "extend to a student's desire to participate in school-sponsored extracurricular activities"). Accordingly, S.B. cannot show that Defendants' actions violated the Texas Constitution's procedural due process guarantees.

Furthermore, even if she could make such a showing, her request for damages under the Texas Constitution, Docket Entry No. 10 at 12, would not be permitted.  *See Univ. of Tex. Sys. v. Courtney*, 946 S.W.2d 464, 468–69 (Tex. App.—Fort Worth 1997, writ denied) ("[W]e find that Courtney could not bring a

---

[8] As explained in *Than*, 901 S.W.2d at 929, the Texas Constitution's Due Course of Law guarantee provides:

> No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land. Tex. Const. art I, § 19.

The Fourteenth Amendment is similar. It provides that:

> No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; . . . U.S. Const. amend. XIV, § 1.

claim for monetary, nonequitable damages against [The University of Texas] under the Texas Constitution's due process provision."). These two barriers prevent S.B. from succeeding with her state law due process claims. As with S.B.'s federal due process claims, her state law constitutional claims will be dismissed with prejudice.

## C.  State Law Bullying-Related Claims

### i.    *Supplemental Jurisdiction*

The only remaining claims are state law ones that attack Defendants' alleged failure to stop S.B. from being bullied and harassed by other students. Under 28 U.S.C. section 1367, federal district courts can exercise supplemental jurisdiction over state law claims "that do not independently come within the jurisdiction of the district court," but only if they "form part of the same Article III 'case or controversy.' The question under section 1367(a) is whether the supplemental claims are so related to the original claims . . . that they 'derive from a common nucleus of operative fact.'" *Halmekangas v. State Farm Fire & Cas. Co.*, 603 F.3d 290, 293 (5th Cir. 2010) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966)). Thus, the Court must find that *Gibbs*'s "common nucleus of operative facts" test is satisfied—as it unquestionably was for S.B.'s state procedural due process claims—before it can exercise jurisdiction over the remaining state law claims.[9]

---

[9] The Court raised this issue *sua sponte* and requested additional briefing from Defendants on

In her state court petition, S.B. asserted claims pertaining to the allegedly unlawful transfer to Alternative Learning Academy; she did not bring any causes of action related to the bullying incidents.  Yet the petition presented several allegations that Defendants failed to stop obvious and known incidents of student assaults and harassment.  Docket Entry No. 1-1 at 5.  The petition contrasted that with the way Defendants responded to the photograph, alleging that they underreacted when she was a victim and overreacted and violated her due process rights when she committed a minor infraction.  Thus, these two seemingly discreet events—the recurring bullying, which mostly occurred during the 2012-2013 school year, and the one-time disciplinary action—were directly tied together as evidence of a broader discriminatory scheme.  *See* 13D Wright and Miller, FED. PRAC. & PROC. § 3561.1 (noting that the supplemental jurisdiction analysis is broader than whether the claims arise out of the same transaction). S.B.'s First Amended Complaint in this Court—in which she did assert state law claims related to the bullying—made her position that the allegations are intertwined even more clear: "[O]fficials[] did nothing to protect S. B. or even investigate when she herself was a clear victim of abuse, but were now unfairly punishing S. B. for unproven alleged minor offenses; [] such punishment was selective enforcement and thus discrimination."  Docket Entry No. 10 at 8.  Because all of S.B.'s claims

---

this issue because they removed the case and have the burden of establishing jurisdiction. Docket Entry No. 20.

thus "focus on the circumstances leading up to" the transfer by emphasizing an overarching discriminatory scheme, the Court can exercise supplemental jurisdiction over the pendant state law claims related to the bullying episodes. *See Bella v. Davis*, 531 F. App'x 457, 458–59 (5th Cir. 2013) (affirming supplemental jurisdiction over state claims when student alleged he was injured in a fight after school failed to stop repeated bullying and harassment); *see also White v. Cnty. of Newberry*, S.C., 985 F.2d 168, 172 (4th Cir. 1993) ("The claims need only revolve around a central fact pattern.").

Furthermore, once a court finds that federal and state claims arise from a common set of facts, the court can and should "consider issues of judicial economy, convenience, and fairness to the litigants." *Flores v. Koster*, 2014 WL 1243676, at *8 (N.D. Tex. Mar. 25, 2014); *see also McCall v. Peters*, 2003 WL 21488211, at *8 (N.D. Tex. May 12, 2003) (exercising supplemental jurisdiction because, among other reasons, "the Court is familiar with the merits of [plaintiff's] claims and has spent a substantial amount of time reviewing the pleadings and researching the legal issues involved, and all parties have expended time and effort in presenting the merits of the case to the Court"). Those factors favor the Court's exercise of supplemental jurisdiction in this case. Both judicial economy and convenience to the parties will be best served by trying these claims together. The Court has already devoted significant resources to resolving the issues raised by

Defendants' motion to dismiss and S.B.'s request for leave to file a second amended complaint. And because the same witnesses are involved in both the federal and state claims, trying them in one forum prevents duplicative discovery efforts and other unnecessary hardships.

For these reasons, after considering this issue *sua sponte*, the Court concludes that it can exercise supplemental jurisdiction over S.B.'s remaining state law claims.

### ii.    Negligence

S.B.'s asserts that Frerking and Barcelona negligently failed to stop her peers' abusive behavior. But because Texas law immunizes school officials from liability in these circumstances, neither the individual nor official capacity negligence claims against them survive dismissal.[10]

The official capacity claims are treated as claims against PISD. *See Goodman v. Harris Cnty.*, 571 F.3d 388, 395 (5th Cir. 2009) ("[O]fficial-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent." (citation and internal quotation marks omitted)).

---

[10] The Court reads S.B.'s negligence claims to be directed solely at Frerking and Barcelona. *See* Docket Entry No. 10 at 11 ("Defendants' negligent failure to take any action to investigate, correct, mitigate, or report the bullying, assaults, and harassment inflicted upon her after the Defendants were given actually notice that she was being bullied, assaulted, and harassed within and outside of Pearland Junior High School South."). But to the extent S.B. formally asserts a negligence claim against PISD—which she has already done in practical effect by suing Frerking and Barcelona in their official capacities—the Court would come to the same conclusion that the claim should be dismissed.

And under Texas governmental immunity law, school districts are state political subdivisions not liable for negligence.  *Barr v. Bernhard*, 562 S.W.2d 844, 846 (Tex. 1978) ("The law is well settled in this state that an independent school district is an agency of the state and, while exercising governmental functions, is not answerable for its negligence in a suit sounding in tort.").  Under the Texas Tort Claims Act, which represents the sole waiver of governmental immunity for torts, the only permissible state tort claim that citizens can bring against a school district in Texas is a claim for misuse of a motor vehicle.  Tex. Civ. Prac. & Rem. Code §§ 101.001, 101.051.  S.B.'s negligence claim is plainly not about motor vehicles—it is about a failure to protect her from bullying.  For that reason, S.B.'s negligence claim against Frerking and Barcelona in their official capacities cannot be maintained.  *See Foston ex rel. S.M.F. v. Galveston Indep. Sch. Dist.*, 2006 WL 2222750, at *2 (S.D. Tex. Aug. 1, 2006) (dismissing suit against school district because plaintiff's negligence claims did not "arise from the operation of a motor vehicle").

The Tort Claims Act also has the effect of extending sovereign immunity to government employees.   Subsection 101.106(f) of the Act, which Frerking and Barcelona invoke, states:

> If a suit is filed against an employee of a governmental unit based on conduct within the general scope of that employee's employment and if it could have been brought under this chapter against the governmental unit, the suit is considered to

be against the employee in the employee's official capacity only.  On the employee's motion, the suit against the employee shall be dismissed unless the plaintiff files amended pleadings dismissing the employee and naming the governmental unit as defendant on or before the 30th day after the date the motion is filed.

Tex. Civ. Prac. & Rem. Code Ann. § 101.106(f).   Thus, for subsection 101.106(f) to apply to a suit against a government employee in his individual capacity, two conditions must be met: (1) the conduct at issue must have been within the general scope of his employment; and (2) the suit could have been brought "under this chapter" against the governmental unit.  *Id.*  The Texas Supreme Court recently construed the second condition to cover any "claim [] in tort and not under another statute that independently waives immunity."  *Franka v. Velasquez*, 332 S.W.3d 367, 381 (Tex. 2011).   Given this broad construction, S.B.'s negligence claims "could have been brought" against PISD under the Tort Claims Act even though the Act does not waive PISD's immunity for such claims. *See id.* at 381; *Kelley v. Chambers Cnty., Tex.*, 2013 WL 1003455, at *4 (S.D. Tex. Mar. 13, 2013).

The only remaining question is whether the conduct at issue occurred in the scope of the officials' employment.  S.B. alleges that Frerking and Barcelona negligently failed to "investigate, correct, mitigate or report the bullying, assaults, and harassment . . . within and outside of Pearland Junior High School South." Docket Entry No. 10 at 11.  Investigating and reporting allegations of bullying or harassment are inherently a part of school officials' professional obligations.

Accordingly, because the conduct at issue indisputably fell within the scope of the officials' employment, the negligence claim against them in their individual capacities must also be dismissed.[11]

While the Texas Tort Claims Act allows plaintiffs to amend their pleadings by dismissing the individual defendants and naming their governmental entity employer within 30 days after a motion to dismiss is filed, Tex. Civ. Prac. & Rem. Code Ann. § 101.106(f), such an amendment would be futile here.  As explained above, the governmental entity that would be named—PISD—is immune from suit.  S.B.'s negligence claims will thus be dismissed with prejudice.

### iii.    Section 261.101 of the Texas Family Code

Section 261.101 of the Texas Family Code requires educators who have "cause to believe that a child's physical or mental health or welfare has been adversely affected by abuse or neglect" to report such behavior.  Tex. Fam. Code § 261.101(a), (b).  S.B. alleges that Frerking and Barcelona violated this provision by failing to report bullying and harassment of S.B. to law enforcement agencies despite "strong evidence of child abuse," though none of that abuse is detailed in the complaint.  Docket Entry No. 10 at 6.  While violating this statute can result in criminal sanctions, *see* § 261.109(b), no civil liability attaches for such violations.

---

[11] In the alternative, Frerking and Barcelona are also entitled to dismissal of this claim under section 22.0511(a) of the Texas Education Code, which provides school district employees from immunity "except in circumstances in which a professional employee uses excessive force in the discipline of students or negligence resulting in bodily injury to students."  Neither of those circumstances is present here.

*See Doe v. S & S Consol. I.S.D.*, 149 F. Supp. 2d 274, 299 (E.D. Tex. 2001) ("[T]he Court finds no authority to suggest any civil actions arise from" an educator's duty to report abuse of a student); *Nash v. Perry*, 944 S.W.2d 728, 729 (Tex. App.—Austin 1997), *rev'd on other grounds by Perry v. S.N.*, 973 S.W.2d 301 (Tex. 1998).  Because S.B. has not shown that Section 261.101 creates a private right of action, her claim attempting to enforce it must be dismissed.

### iv.   *Section 38.004 of the Texas Education Code*

Section 38.004 of the Texas Education Code states that "The [Texas Education] [A]gency shall develop a policy governing the reports of child abuse or neglect required by Chapter 261, Family Code, of school districts, open-enrollment charter schools, and their employees." Tex. Educ. Code §§ 38.004(a), (a-1); 5.001(1) (defining the agency in section 38.004 as the Texas Education Agency). Just as with her claim under section 261, S.B. has not shown that any civil liability attaches for a violation of this section.  Moreover, she has not shown that the statute imposes any obligations on individual administrators or even school districts; rather, the statute appears only to be directed at a governmental entity— the Texas Education Agency.  And furthermore, even if the statute did impose civil liability on individual administrators or school districts, S.B. has failed to allege any facts that Frerking and Barcelona (or PISD) failed to "develop a policy governing the reports of child abuse."  For these reasons, the section 38.004

claim—whether it is being brought against just Frerking and Barcelona (as the Court interprets it) or also against PISD—merits dismissal.

## IV.   MOTION TO AMEND

All of S.B.'s claims pending in her live pleading—the First Amended Complaint—have thus been dismissed with prejudice.  In the normal course, that would be the end of the case.  But after the parties finished briefing the issues raised by Defendants' motion to dismiss, S.B. sought leave to amend her complaint and assert three new claims: (1) a retaliation claim based on Defendants' roles in causing two criminal actions—a truancy charge and a charge for electronic transmission of a matter depicting a minor—to be brought against her in state court; (2) an equal protection claim for treating her differently than male and female students who committed similar offenses; and (3) a free speech and privacy claim.[12]   Docket Entry Nos. 18; 18-1.  Though leave to amend should be freely given "when justice so requires," Fed. R. Civ. P. 15(a)(2), the Court may deny amendment for numerous reasons, including "undue delay, bad faith or dilatory

---

[12] The Court is uncertain whether S.B. is also attempting to assert a new "deliberate indifference" claim under section 1983.  If she is, the claim would be barred.  For a school district to be liable under section 1983 based on its failure to prevent student-on-student harassment, it "must first have a constitutional duty to protect [a student] from non-state actors."  *Estate of Brown v. Cypress Fairbanks Indep. Sch. Dist.*, 863 F. Supp. 2d 632, 638 (S.D. Tex. 2012).  That duty cannot arise "absent a special relationship."  *Id.* (citing *Doe v. Covington Cnty. Sch. Bd.*, 675 F.3d 849 (5th Cir. 2012)).  But the Fifth Circuit has expressly held that schools do not have a special relationship with their students; therefore, Defendants did not have a constitutional obligation to prevent S.B. from being bullied by non-state actors, *i.e.*, other students.  *See Covington*, 675 F.3d at 863.  A deliberate indifference claim under section 1983 would therefore be futile.

motive on the part of the movant . . . or futility of a proposed amendment." *United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 270 (5th Cir. 2010). Defendants object to S.B.'s motion for leave to amend on two of those recognized grounds: futility and undue delay.  *See* Docket Entry No. 19.

An amended complaint is futile if it "would fail to state a claim upon which relief could be granted."  *Stripling v. Jordan Prod. Co., LLC*, 234 F.3d 863, 873 (5th Cir. 2000).  Thus, "to determine futility, [courts] apply the same standard of legal sufficiency as applies under Rule 12(b)(6)."  *Id.* (citation and internal quotation marks omitted).  The Court first addresses whether S.B.'s retaliation and equal protection claims are futile before turning to her free speech claim.

### A. Retaliation and Equal Protection Claims

S.B.'s retaliation and the equal protection allegations suffer from a conspicuous lack of detail.  Foundationally, they do not state the statutes under which they are being brought, or, with regard to the equal protection claim, whether the source of law is state or federal.  They also do not alert Defendants— or the Court—as to what conduct is at issue.  For instance, what conduct did Defendants retaliate against S.B. for—was it filing this suit or reporting bullying incidents? S.B.'s claim that Defendants violated equal protection principles by treating other students with similar infractions differently likewise raises a basic question: Which other students?  And there is no allegation that any disparate

treatment S.B. suffered flowed from being a member of a suspect classification. S.B.'s claims lack any factual support to begin answering these questions. They thus do not satisfy the Rule 12 pleading standard, *see Twombly*, 550 U.S. at 570, and would face certain dismissal. *See, e.g.*, *Rose v. Upshur Cnty., Tex.*, 2012 WL 2088663, at *3 (E.D. Tex. June 8, 2012) (dismissing employee's retaliation claim because plaintiff's complaint left "the Court guessing about important details" of his claim, such as the nature of the harassment he reported to his employer); *Kyles v. Garrett*, 222 F. App'x 427, 429 (5th Cir. 2007) (affirming dismissal of prisoner's equal protection claim because aside from "conclusional allegations that others similarly situated ha[d] been granted parole . . . [he] offer[ed] no specific factual support for his assertions."); *Preston v. Hilton Cent. Sch. Dist.*, 876 F. Supp. 2d 235, 244 (W.D.N.Y. 2012) (dismissing male student's equal protection claim for failure to state "facts identifying similarly-situated students or describing the treatment of female complainants by the defendants in like circumstances.").

### B. Free Speech Claim against Frerking and Barcelona[13]

Whether S.B.'s free speech claim against Frerking and Barcelona in their individual capacities is futile requires a different level of analysis. It certainly

---

[13] The Court need not devote attention to S.B.'s privacy claim because it fails for the same lack of detail as the previous claims. In fact, it is entirely devoid of any information that would assist the Court in resolving it. Is S.B. asserting that Frerking and Barcelona wrongfully took S.B.'s phone in order to locate the photo? Or was the privacy violation that they knew about the photo in the first place? What is the source of law S.B. is relying upon? The complaint is unclear. The privacy claim thus fails for the same reasons the retaliation and equal protection claims do: it does not meet *Twombly*'s pleading standard.

raises some interesting questions.  For instance, what protection does the First Amendment afford off-campus speech?  *Cf. Porter v. Ascension Parish Sch. Bd.*, 393 F.3d 608, 615 n.22 (5th Cir. 2004) (noting the "difficulties posed by state regulation of student speech that takes place off-campus and is later brought on campus").  Does a "lewd" photograph of a minor convey a particularized message that would entitle it to First Amendment protection as expressive conduct?  *Compare T.V. ex rel. B.V. v. Smith–Green Comm. Sch. Corp.*, 807 F. Supp. 2d 767, 776 (N.D. Ind. 2011) (finding that First Amendment protected images of high school students who took provocative photos to display a "particularized message of crude humor") *with Montefusco v. Nassau Cnty.*, 39 F. Supp. 2d 231, 242 n.7 (E.D.N.Y. 1999) (observing in dicta that court might reject argument that adult's photo of minor was entitled to First Amendment protection).  The answers to these questions have not been fully resolved, and this Court need not tackle them in great depth here.

Instead, Defendants raise a threshold question: Are Frerking and Barcelona entitled to qualified immunity based on the proposed pleading?[14] "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or

---

[14] S.B. alleges in her proposed Second Amended Complaint that section 1983 "trumps" any claim of governmental immunity.  It goes without saying that this argument is wrong; the paradigmatic use of qualified immunity is as a defense in section 1983 cases.  *See Harlow v. Fitzgerald*, 457 U.S. 800, 818–19 (1982).

constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  An official's acts violate clearly established law if "at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. Al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (alterations, citation, and internal quotation marks omitted).  The burden is on the plaintiff in each case to demonstrate that the defense is inapplicable. *See McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (en banc) (per curiam).  Thus, in each case, the plaintiff must first show that the defendants committed a constitutional violation, and second show that the qualified immunity defense is inapplicable. *Atteberry v. Nocana Gen. Hosp.*, 430 F.3d 245, 253 (5th Cir. 2005) (citations omitted). Following *Pearson*, 555 U.S. at 236, courts have discretion in choosing which prong of the analysis to consider first.  In analyzing whether this proposed claim is futile, the Court finds it appropriate to evaluate whether S.B.'s rights were clearly established at the time she was punished.

Although "clearly established law" does "not require a case directly on point," "existing precedent must have placed the statutory or constitutional question beyond debate." *Al-Kidd*, 131 S. Ct. at 2083–84.  In the absence of controlling authority, an issue is considered clearly established only if it is

supported by a "robust 'consensus of cases of persuasive authority.'"  *Id.* at 2084 (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)).

While photographs are not the classic "speech" that the First Amendment safeguards, they nonetheless can fall within the ambit of the First Amendment if they "communicate some idea." *Montefusco*, 39 F. Supp. 2d at 241–44. "Indeed, the Supreme Court has held that pure conduct possesses sufficient communicative elements to implicate the First Amendment if the 'intent to convey a particularized message was present' and if 'the likelihood was great that the message would be understood by those who viewed it.'" *Smith–Green*, 807 F. Supp. 2d at 775 (quoting *Texas v. Johnson*, 491 U.S. 397, 404 (1989)).  The Supreme Court thus has held that "nude dancing . . . is expressive conduct," but only barely so, emphasizing that such conduct was "within the outer perimeters of the First Amendment" and "only marginally" entitled to constitutional protection. *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 565–66 (1991).

Take out the dancing, add in the minor element and the school context, and the law is not clear whether the lewd photograph in this case is entitled to First Amendment protection.  Of course, the Supreme Court has held that states can ban child pornography without running afoul of the First Amendment. *See New York v. Ferber*, 458 U.S. 747, 763 (1982) ("Recognizing and classifying child pornography as a category of material outside the protection of the First

Amendment is not [] incompatible with our earlier decisions.").  Young adults—in many cases, individuals not much older than S.B.—have been prosecuted in state and federal courts for receiving or sending sexually provocative pictures of boyfriends or girlfriends only one or two years younger than they are.  *See, e.g.*, *United States v. Nash*, --- F. Supp. 2d ----, 2014 WL 868628, at *1 (N.D. Ala. Mar. 5, 2014) ("An odd day arises when a young man, who could legally have consensual sex with his sixteen-year-old girlfriend, will forever be labeled a sex offender for receiving provocative pictures of her that she sent him via text message."); *id.* at *4 ("[A]n eighteen-year-old Florida man was convicted of distributing child pornography after sending nude pictures of his sixteen-year-old ex-girlfriend to her friends and family in a fit of anger over their breakup (the girl had taken the photos of herself."); *see also* John Humbach, *'Sexting' and the First Amendment*, 37 Hastings Const. L. Q. 433, 434–36 (2010) (compiling numerous examples of prosecutions or threatened prosecutions for minors under child pornography laws; one 14-year-old girl was arrested for posting approximately thirty nude pictures of herself to MySpace).  Thus, this is not a case in which a right has been clearly established at a "high level of generality" but not at a sufficiently specific one.  *See, e.g.*, *Pittman–Bey v. Celum*, 2014 WL 575910, at *2 (5th Cir. Feb. 14, 2014).  Rather, a significant portion of the case law runs counter to S.B.'s argument that the First Amendment protects her right to send and receive

lewd images of her friends. *Cf. Morgan v. Swanson*, --- F.3d ----, 2014 WL 1316929, at *2 (5th Cir. Apr. 2, 2014) ("In concluding that a particular right is clearly established, courts must rely only on authority that existed at the time of the disputed conduct; conversely, courts may consider newer contrary authority as evidence that the asserted right is *not* clearly established." (italics in original)).

In the one instance that the Court has found in which a federal court held that sexually suggestive images of minor students distributed off campus were constitutionally protected, the court weaved a narrow thread: the images did not actually constitute child pornography under state law and were "intended to be humorous to the participants and to those who would later view the images." *See Smith–Green*, 807 F. Supp. 2d at 786–87. Thus, the fact that the images were intended to convey a funny—albeit crude—message to a specific audience was critical to the court's holding. But the court still concluded, after a thorough survey of the school law canon, that the right to take and distribute such photographs was not clearly established at the time the students were punished. *See id.* (holding that individual defendants were entitled to qualified immunity given "the current state of the developing law in this context, particularly involving student speech originating off-campus and by use of the internet."). And a single district court decision from outside this Circuit does not clearly establish any such right.

The proposed allegations give the Court no way of knowing what S.B.'s photograph actually displayed, what idea it was intended to express, or with whom it was meant to be shared; the only inference the Court can draw based on the Complaint is that it was a "lewd" image of a minor.  Without any allegations indicating that S.B.'s photo expressed a particular message—in the context of a school law free speech regime that "can be difficult and confusing, even for lawyers, law professors, and judges"—the Court cannot conclude that Frerking and Barcelona violated S.B.'s clearly established constitutional rights.  *Id.* (quoting *Doninger v. Niehoff*, 642 F.3d 334, 353 (2d Cir. 2011)); *see also Porter*, 393 F.3d at 615 n.22 (noting the conflicting approaches courts have taken to the regulation of off-campus speech that is later brought on campus); *J.C. ex rel. R.C. v. Beverly Hills Unified Sch. Dist.*, 711 F. Supp. 2d 1094, 1126 (C.D. Cal. 2010) (noting a pronounced "uncertainty as to the boundaries of the school speech precedents" (citation omitted)); *id.* ("[T]he contours of a student's First Amendment right to make a potentially defamatory and degrading video about a classmate, which is almost immediately thereafter brought to the School's attention, are not clearly established.").  Accordingly, allowing the claim to proceed against these individuals would be futile.

### C. Free Speech Claim against PISD

Although qualified immunity is not a defense PISD can invoke, S.B.'s free speech claim against PISD (and the individual defendants in their official capacities, which is the same thing) fails for another reason. To succeed on that claim under section 1983,[15] S.B. must show that the constitutional violation was caused as a direct result of a PISD custom, policy or practice that was approved by PISD's "final policymaker"—the school board. *See City of Houston v. Piotrowski*, 237 F.3d 567, 578 (5th Cir. 2001); Tex. Educ. Code § 11.051 (requiring independent school districts to be governed by a board of trustees who shall oversee the management of the district). The allegations in the proposed complaint, however, only attack the principals of her school, and fail to show any involvement by the school board. Furthermore, they set out no allegations of a PISD custom, policy, or practice in even a conclusory fashion. Therefore, this claim would not survive a renewed motion to dismiss. *See, e.g.*, *Whitley v. Hanna*, 726 F.3d 631, 649 (5th Cir. 2013) (affirming denial of motion to amend official policy claim on futility grounds when "proposed amended complaint ma[de] no specific factual allegations of the county's policies and simply add[ed] the words 'policies, practices, and/or customs' to [plaintiff's] perceived wrongs."); *Allen v. Burnett*, 2013 WL 2151218, at *3 (N.D. Tex. May 17, 2013) (dismissing

---

[15] Though the proposed Second Amended Complaint does not specifically mention section 1983 as the source for this claim, section 1983 is the typical vehicle for bringing a free speech claim against a governmental entity.

claim against city when plaintiff did "not allege specific policies that were officially adopted and promulgated" by the city).[16]

## V.   CONCLUSION

For the reasons explained above, Defendants' Motion to Dismiss (Docket Entry No. 13) is **GRANTED** and Plaintiff's Motion to Amend (Docket Entry No. 18) is **DENIED**.   This case is therefore **DISMISSED WITH PREJUDICE**. Final judgment will issue by separate order.

**SIGNED** this 28th day of May, 2014.

_____
Gregg Costa
United States District Judge

---

[16] S.B.'s proposed amendments will thus be denied on the ground that they are futile and would not survive a subsequent motion to dismiss.  The Court need not rule on Defendants' "undue delay" objection.